THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

KELSEY D. CRYSTALOSKI,                      )
                                            )
                    Plaintiff,              )        Civil Action No. 09-965
        v.                                  )
                                            )
                                            )
MICHAEL J. ASTRUE, COMMISSIONER             )
OF SOCIAL SECURITY                          )
                                            )
                    Defendant.              )

MEMORANDUM OPINION

**CONTI**, District Judge

### *Introduction*

Pending before this court are cross-motions for summary judgment with respect to an appeal from the final decision of the Commissioner of Social Security ("Commissioner" or "defendant") denying the claims of Kelsey Crystaloski ("Crystaloski" or "plaintiff") for child disability insurance benefits ("DIB") under Title II of The Social Security Act (the "Act"), 42 U.S.C. §§ 401-33, and supplemental security income ("SSI") under Title XVI of the Act, 42 U.S.C. §§ 1381-83. Plaintiff contends that the decision of the administrative law judge (the "ALJ") that she is not disabled, and therefore not entitled to benefits, should be reversed because the decision is not supported by substantial evidence. Defendant asserts that the decision of the ALJ is supported by substantial evidence. The parties filed cross-motions for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. The court will deny the motions for summary judgment and will remand the case for further proceedings consistent with this opinion because the decision of the ALJ is not supported by substantial evidence.

### *Procedural History*

Crystaloski filed the applications at issue in this appeal on April 5, 2006, asserting a disability since April 5, 2006 due to anxiety, bipolar disorder, attention deficit hyperactivity disorder ("ADHD)" and oppositional defiant disorder.  (R. at !03A, 106-09, 112.)   On August 7, 2006, her claims were initially denied.  (R. at 99-103.)  A timely written request for a hearing before an administrative law judge was filed by plaintiff, and the hearing was held on May 30, 2007. (R. at 57-97.) Plaintiff appeared with counsel and testified at the hearing, along with her adoptive mother, Marcia Detore ("Ms. Detore").  (*Id.*)  In a decision dated August 31, 2007,  the ALJ determined that plaintiff was not under a disability within the meaning of the Act.  (R. at 42.)  The ALJ determined plaintiff had the severe impairments of bipolar disorder and a history of ADHD, adjustment disorder, personality disorder, oppositional defiant disorder, anxiety and drug and alcohol abuse. (R. at 33.) Plaintiff was found to have the residual functional capacity ("RFC") to perform a full range of work at all exertional levels, but that she was limited to simple and routine tasks not performed in a production or quota-based environment involving only simple, work-related decisions, and in general, relatively few work place changes, and limited to occasional communication with supervisors and that she must avoid communications with co-workers and the general public.  (R. at 37-40.)  Plaintiff filed a timely request to review the ALJ's decision, which was denied by the Appeals Council on January 30, 2009 (R. at 9-11.) Plaintiff filed this present action seeking judicial review.

*Plaintiff's Background, Medical Evidence and Testimony*

*Background*

Plaintiff was born April 29, 1988 and has a 10th grade education.  In 1995 plaintiff was placed in foster care due to abuse and neglect from her biological mother. (R. at 131.)  By reason of plaintiff's bad behavior, her sister and she were moved between multiple foster homes until she was placed with Ms. Detore in 1997, who adopted her in 2000.  (*Id*.)  Plaintiff previously was awarded SSI benefits as a child due to her mental health issues from April 1998 to 2000 when she was adopted and became eligible to receive auxiliary benefits due to her adopted mother's disability.  (R. at 82.)

In the questionnaire of plaintiff's activities of daily living, plaintiff stated that on a typical day she would go to school, talk with friends, eat, cook, shower and take her medication. (R. at 125.)  She stated that she relies on her mother to wake her up in the morning and remind her to do her chores. (*Id*.)  In the questionnaire it was reported that plaintiff has mixed reactions to authority figures depending on the context and that she is very defiant with her mother. (R. at 126.)  She does not respond well to criticism and will argue, yell, hit and get physical at times. (*Id*.) Plaintiff fights and argues in public. (R. at 127.)  When faced with carrying out instructions and dealing with changes in her daily schedule, plaintiff becomes frustrated and upset and will throw fits and lose control.  (*Id*.)  Plaintiff has a hard time making decisions and she has to be reminded by her mother to take her medication. (R. at 128.)  Plaintiff lost her previous job at a fast food restaurant due to her behavior.  (*Id*.)  Plaintiff's mother stated in the questionnaire that plaintiff's temper is very difficult to control and that she has had mental health problems since she was a small child. (R. at 129.)

*Medical Evidence*

Plaintiff was seen for a check up at Latrobe Area Hospital on July 18, 2005, where it was noted that her moods were good, although she had "ups and downs" and she was cooperating in taking her medication. (R. at 189.) On October 11, 2005, Dr. Ahmed Jahangeer saw plaintiff for a follow-up appointment. He noted that plaintiff had been disrespectful at home and had a bad attitude, although she did not display physical aggression and her sleep was adequate. (R. at 188.) On January 26, 2006, Dr. Jahangeer saw plaintiff and noted that she had been poorly focused, very moody, and had sleep problems. (R. at 187.) On February 28, 2006, plaintiff was seen for a follow-up visit and it was noted that plaintiff continued to be disrespectful and defiant. (R. at 186.)

Plaintiff was admitted to the Latrobe Area Hospital on March 21, 2006 due to severe agitation that led to the assault of the school principal. (R. at 181.) Plaintiff was angry that her cell phone was taken away and she slapped the principal in the face. (*Id*.) The police were called and plaintiff was cited for disorderly conduct. (R. at 135, 181.) Dr. Ahmed Jahangeer recounted that plaintiff had a history of emotional lability with periods of severe agitation and aggressive behavior. (R. at 181.) Plaintiff stated that she did not remember slapping the school principal and did not show remorse. (*Id*.) Dr. Jahangeer noted that plaintiff appeared to be proud of her actions. (*Id*.) Dr. Jahangeer noted that plaintiff was on Depakote[1] and Strattera[2] and that she had

---

[1] Depakote is "indicated for the treatment of acute manic or mixed episodes associated with bipolar disorder," "complex partial seizures" and "migraine headaches." *Physician's Desk Reference* 424 (63rd ed. 2009). Adverse side effects of Depakote include "nausea, somnolence, dizziness, vomiting, . . . rash." *Id.* at 423.

[2] Strattera is "indicted for th treatment of Attention-Deficit/Hyperactivity Disorder (ADHD). *Physician's Desk Reference* 1865 (63rd ed. 2009). Adverse side effects of Strattera include "abdominal pain, vomiting, nausea, constipation, fatigue, ... mood swings." *Id.* at 1867.

previously been on Adderall[3] and Paxil.[4] (*Id.*) Plaintiff was discharged on March 24, 2006 and her mental status was assessed to be without thoughts or intentions of her hurting herself or others and without any psychotic symptoms. (R. at 183.) Plaintiff was found to have very poor insight, but was capable of understanding right from wrong. (*Id.*) She was diagnosed as having Bipolar Affective Disorder, Oppositional Defiant Disorder, ADHD and Borderline Intellectual Functioning with a Global Assessment of Functioning ("GAF") score of 45.[5] (*Id.*) Plaintiff had a follow-up visit with Dr. Jahangeer on March 29, 2006; where he noted that plaintiff had another argument with her sister and that she had poor concentration and insight, although her judgment was average and sleeping was good. (R. at 179.)

On May 23, 2006, plaintiff went to the emergency room ("ER") at Westmoreland Regional Hospital due to acute alcohol intoxication. (R. at 207-13.) On June 7, 2006, plaintiff was brought to the ER due to smoking marijuana laced with an opiate. (R. at 215-19.) Plaintiff was asymptomatic throughout her visit and was diagnosed with substance abuse. (R. at 216.) On July 6, 2006, plaintiff went to the ER due to heart palpitations, headache and lightheadedness after smoking a homemade cigarette. (R. at 250-54.)

---

[3]Adderall is "indicted for the treatment of Attention Deficit Hyperactivity Disorder (ADHD). *Physician's Desk Reference* 3013 (63rd ed. 2009). Adverse side effect of Adderall include "abdominal pain, accidental injury, asthenia, fever, infection, viral infection, loss of appetite, diarrhea, dyspepsia, nausea, vomiting, dizziness, emotional liability, insomnia, nervousness, and weight loss." *Id.* at 3015.

[4]Paxil "is indicated for the treatment of major depressive disorder. . . . obsessive compulsive disorder . . . . panic disorder. . . ." *Physician's Desk Reference* 1536 (63rd ed. 2009). Adverse side effects of Paxil include: "asthenia, sweating, nausea, decreased appetite, somnolence, dizziness, insomnia, tremor, nervousness, . . . . dry mouth, . . . constipation. . . ." *Id.* at 1541.

[5] The Global Assessment of Functioning ("GAF") scale, designed by the American Psychiatric Association, ranges from zero to one hundred and assesses a person's psychological, social and occupational function. *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR), 34 (4th ed. 2000). A GAF score between 41-50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting ) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id.*

Plaintiff again was seen at the ER on July 21, 2006, for shortness of breath and heart palpitations. (R. at 264.)  Plaintiff stated that she was in a verbally abusive relationship and that she was lying about being pregnant so she would not be abused. (R. at 265.)  Plaintiff's symptoms were diagnosed as being caused by anxiety. (*Id.*)  After being released plaintiff returned to the ER later that day due to crying, tearfulness and difficulty breathing.  (R. at 274-83.)  It was noted that plaintiff had stopped taking her Depakote and Strattera and she was placed on Ativan.[6]  (R. at 274.)  It was observed that plaintiff had decreased motor activity, was appropriately dressed, had a blunt affect, was anxious, tearful, depressed and was having much worse panic attacks.  (R. at 280.)  Her attitude was cooperative but withholding, and she was properly oriented, but was having racing thoughts and had poor concentration. (*Id.*)

On July 27, 2006, plaintiff went to the ER due to an anxiety attack and it was noted that she could not remember to take her medication since she moved out her mother's house. (R. at 297.)  She stated that she felt better when taking her medication, but she stopped taking them because she did not get refills. (R. at 300.)  After being released plaintiff returned to the ER two hours later complaining again of shortness of breath, chest pain and heart palpitations.  (R. at 304-06.)  On July 29, 2006, plaintiff was taken to the ER due to passing out, along with lightheadedness, tightness in her chest and anxiety. (R. at 313-17.)

On July 30, 2006, plaintiff was admitted to Mercy Jeannette Hospital due to chest pain. (R. at 321.)  Dr. Ayesha Hossain diagnosed plaintiff with has bipolar disorder and noted that she

---

[6]"Ativan is used to treat anxiety disorders."  http://www.drugs.com/ativan.html (last visited 9/10/2010). Serious side effects include "confusion, depressed mood, thoughts of suicide or hurting yourself; hyperactivity, agitation, hostility; hallucinations; or feeling light-headed, fainting.  Less serious Ativan side effects may include: drowsiness, dizziness, tiredness; blurred vision; sleep problems (insomnia); muscle weakness, lack of balance or coordination; amnesia or forgetfulness, trouble concentrating; nausea, vomiting, constipation; appetite changes; or skin rash."  *Id.*

was in the ER of Westmoreland Regional Hospital and Mercy Jennette Hospital on almost a weekly basis. (*Id*.)  Plaintiff had stopped taking all her medications and passed out at home.  (*Id*.)  Dr. Hossain noted that physically plaintiff's test were normal and that she was doing well. (*Id*.).  Dr. Hossain also noted that plaintiff indicated that she was "trying to get pregnant badly." (*Id*.)

On August 1, 2006, plaintiff reported to Westmoreland Regional Hospital's ER due to an anxiety attack. (R. at 337-345.)  It was noted that plaintiff's mother asked plaintiff voluntarily to commit herself.  Plaintiff, however, refused. (R. at 337A-38).  On August 2, 2006, plaintiff began treatment at the comprehensive counseling center at Westmoreland Regional Hospital and was scheduled for a follow-up visit on August 8, 2006. (R. at 484-85.)  On August 6, 2006, plaintiff reported to Mercy Jeannette Hospital's ER due to chest pain and anxiety attack.  (R. at 347-51.)  Plaintiff's mental health was assessed at the outpatient behavioral health clinic on August 7, 2006, and her GAF was found to be 50. (R. at 475) On August 14, 2007, plaintiff was interviewed by therapist Susan Grimes. (R. at 476-83.)

On August 24, 2006, plaintiff was in the Westmoreland Regional Hospital's ER due to abdominal pain and it was noted that plaintiff was one month pregnant. (R. at 353-57.)  On August 28, 2006, plaintiff was seen by Dr. Ahmad for an outpatient psychiatric evacuation. (R. at 466-67.)  Dr. Ahmad noted that plaintiff had previously been pregnant and had a miscarriage and was now currently two months pregnant. (*Id*.)  He stated that she currently was not on any medications, but prior to that she was on Lexapro and she felt it was helping relieve her anxiety.  (*Id*.)  Dr. Ahmad found plaintiff to be neatly dressed, pleasant, cooperative and well oriented.  (R. at 467.)  She was not delusional, although she reported being very irritable and severely anxious.

(*Id*.)  Her insight was found to be limited and judgment fair and her GAF was assessed to be 48. (*Id*.)

Treatment notes on August 31, 2006, by Susan Grimes indicate that plaintiff stopped taking her medication due to her pregnancy. (R. at 465.)  It was stated that plaintiff and her mother were not getting along and that she was being very disrespectful. (*Id*.)  Additionally, it was noted that plaintiff was having a decrease in chest pains. (*Id*.)  Later that day, however, plaintiff went to Mercy Jeannette Hospital's ER due to chest pain and difficultly breathing. (R. at 364-68.) On September 13, 2006, plaintiff had a psychiatric evaluation review where she was found not to have any more panic attacks and her mood was fine and that she had a GAF score of 55.[7]  (R. at 464.)  On that same day, plaintiff was seen by Susan Grimes and she noted that plaintiff withdrew from school, showed no caring and was verbally abusive to her mother. (R. at 463.)

On September 20, 2006, plaintiff was seen for abdominal pain as well as lightheadedness and hyperventilation at the Westmoreland Regional Hospital's ER.  (R. at 381-85.)  It was noted that plaintiff had not been taking medication for her urinary tract infection. (R. at 384.)  On September 29, 2006, notes from Mercy Jeannette Hospital's ER stated that plaintiff initially came in with complaints of vomiting and being unable to eat for three days.  She said she was having chest pains and indicated that she was three months pregnant.  (R. at 400.)

On October 10, 2006, plaintiff fell down carpeted stairs and was seen for low back pain at Westmoreland Regional Hospital's ER.  (R. at 410.)  It was also noted that plaintiff left without

_____

[7]A score between 51-60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  *Diagnostic and Statistical Manual of Mental Disorders*, (DSM-IV-TR), 34 (4th ed. 2000).

treatment and the nurse was unable to find plaintiff in the entire unit. (R. at 411.) On October 22, 2006, plaintiff was seen for abdominal pain resulting from her falling down. She, however, refused to have an ultra sound examination and was warned about the risk of refusing. (R. at 414-16.) On October 26, 2006, plaintiff was seen for abdominal pain and stated that she did not take medication for a urinary tract infection because she did not think she had an infection. (R. at 422.) It was also noted that plaintiff was tearful on the phone and that she was offered support, but declined. (R. at 426.)

On November 28, 2006, plaintiff was involuntarily committed to Westmoreland Regional Hospital due to self-abusive behavior and threatening to harm her baby. (R. at 452.) It was noted by Dr. Efren Leonida that plaintiff was hitting her stomach in the ER. (R. at 454.) Dr. Saghir Ahmad noted that plaintiff had stopped taking her Depakote due to her pregnancy and that her mood became unstable since she stopped taking it. (R. at 452, 457.) Plaintiff was reported as being very irritable and violent during the first twenty-four hours of the commitment and that she did not want to live or carry the pregnancy anymore. (R. at 457.) Dr. Ahmad reported that plaintiff had been hitting her stomach and that she tried to jump out of a moving vehicle. (*Id.*) Plaintiff attempted to escape from the unit and stated that she wanted to be with her boyfriend. (R. at 458.) Plaintiff calmed down after the initial twenty-four hours and plaintiff's mother agreed for plaintiff to live with her again, provided that she did not display any more abnormal behavior. (R. at 452.) At the time of the commitment, plaintiff's GAF score was assessed as 30.[8]

---

[8]A score between 21-30 indicates that "[b]ehavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoherent, acts grossly inappropriately, suicidal preoccupation) OR inability to function in almost all areas (e.g., stays in bed all day; no job, home or friends)." *Diagnostic and Statistical Manual of Mental Disorders*, (DSM-IV-TR) 34 (4th ed. 2000). A score between 31-40 indicates "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment,

(*Id.*)  Upon discharge, on December 1, 2006, Plaintiffs GAF score was 42, and she was found to be well oriented and had no delusions or suicidal or homicidal ideation.  Her insight was limited and judgment was fair.  (R. at 452-53.)

On December 11, 2006, plaintiff had a mental health status check up.  It was noted that she felt stable and her GAF score was found to be 50.  (R. at 461.)  On December 18, 2006, plaintiff was seen in the ER for a head injury, where she stated she had tripped on a cat at the top of the steps, became dizzy, and lost sight for a second and might have hit her stomach.  (R. at 624.)  The nurse noted that plaintiff left prior to exam. (R. at 625.)

On January 3, 2007, plaintiff was involuntarily committed to Westmoreland Regional Hospital.  (R. at 516-23.)  Plaintiff's sister indicated that plaintiff had punched herself in the stomach, threatened the lives of multiple people and inflicted harm on herself and others.  (R. at 516.)  The petition for commitment indicated that plaintiff stated that she did not want the baby and that she would kill the baby if the baby's father does not stay with her. (*Id*.)  Dr. Charles Franchino noted that plaintiff was cooperative during the course of her stay and denied any intent to harm herself or her fetus. (*Id*.)  Plaintiff stated that the source of her problems was her sister and that her sister made false allegations with respect to the commitment petition. (*Id*.)  Plaintiff refused medication and Dr. Franchino found plaintiff to be fine without the medication.  (R. at 516.)  Dr. Franchino found plaintiff's cognition to be intact, her insight limited, judgment impulsive and her GAF score to be 50 upon admission and discharge.  (R. at 517.)  Plaintiff was given an inpatient psychiatric assessment by certified physician assistant Jeffery Turgeon. (R. at

thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." (*Id.*)

521-22.) He noted that plaintiff denied all the claims in the commitment petitions and that she stated that her sister frequently argues with her and was hitting her, but she gave very vague reasons for that conduct. (R. at 521.) Plaintiff claimed that her sister had her committed just to be mean to her. (*Id*.) Plaintiff denied any crying spells, depressed mood, or having trouble with her temper or anger. (*Id*.) Plaintiff was found to be irritable during examination and made very poor eye contact. (R. at 522.) Her insight and judgment were found to be very poor and her personality somewhat childish. (*Id*.) It was noted that her boyfriend had split up with her and her GAF score was found to be 30. (R. at 523.)

Plaintiff was seen at the Westmoreland Regional Hospital's ER on January 3 and 8 , 2007, for back and abdominal pain. (R. at 611-16.) Susan Grimes saw plaintiff on January 26, 2007, and reported that plaintiff appeared to look good, was pleasant and seemed positive about the baby. (R. at 633.) Dr. Ahmed noted on January 8, 2007, that plaintiff refused to take Abilify during commitment and that she wanted to be put on Depakote postpartum. (R. at 641.) Dr. Ahmed assessed plaintiff's GAF to be 50. (*Id*.) On February 23, 2007, Susan Grimes stated that plaintiff seemed to be doing well and to be more sensible about her family situation. (R. at 639.)

On March 10, 2007, plaintiff was seen for back pain. (R. at 608-10.) On March 26, 2007, plaintiff went to the ER for shortness of breath, chest pain and pressure, and headache. (R. at 597-601.) On April 10, 2007, Dr. Ahmed assessed plaintiff's GAF score at 50. (R. at 635.) Dr. Ahmed saw plaintiff on May 8, 2007 and stated that she had no depression or mood swings. Plaintiff stated that medication made her feel dizzy. (R. at 637.) On May 16, 2007, plaintiff went to ER for chest pain and panic attack. (R. at 588.) She stated that every panic attack was different and she might be pregnant. (*Id*.) It was noted that she was six weeks postpartum. (R. at

11

591.)  On May 23, 2007, Susan Grimes saw plaintiff and noted that since plaintiff had the baby she had daily panic attacks that lasted all day.  (R. at 636.)

Plaintiff was seen at the ER for abdominal pain on June 6, 2007 and again on June 8, 2007.  (R. at 573, 579.)  On June 21, 2007, plaintiff went to the ER due to a panic attack, shaking and her heart racing.  (R. at 563-67.)  Plaintiff was seen for a panic attack and heart palpitations on June 27, 2007, at the Westmoreland Regional Hospital's ER.  (R. at 553-57.)  On June 2, 2007, plaintiff went to ER due to a facial injury resulting from a direct blow that was the result of an altercation.  (R. at 547.)  Plaintiff was seen for a panic attack, hyperventilation and heart palpitations on June 7, 2007, in the Westmoreland Regional Hospital's ER.  (R. at 539-42.)  It was noted that plaintiff refused to take Ativan.  (R. at 542.)  On June 12, 2007, plaintiff was seen for abdominal pain, chest pain and vomiting.  (R. at 530.)  It was noted that plaintiff was anxious and that her symptoms of abdominal pain do not occur when she eats at home.  (R. at 534.)  On June 14, 2007, plaintiff was seen for heart palpitations at the ER.  (R. at 525-26.)

### Testimony

The hearing before the ALJ was held on May 30, 2007.  (R. at 58.)  At the hearing plaintiff's attorney amended plaintiff's onset date to be the day before plaintiff's eighteenth birthday to allow for the SSI and DIB claims to be done using the adult analysis.  (R. at 69.)  Plaintiff stated that her most serious impairment was her anxiety attacks.  (R. at 74.)  Plaintiff admitted that she had problems for quite a few years and that neglect and abuse from her biological parents may be a cause of her emotional problems.  (R. at 76-77.)  Plaintiff stated that she could not concentrate and that she had a panic attack the night before the hearing.  (R. at 77-

78.)  She stated that she felt confined and scared and that she started "freaking out."  (R. at 78.)

The ALJ asked plaintiff at the hearing:

> Why should I not believe that you're just a spoiled kid who's trying
> your best to get some free money because as long as you complain
> everybody seems to want you know, help you out?  Why shouldn't
> I think that you're not just working the system?

(R. at 80.)  Plaintiff stated that she was not trying to work the system and stated that she did not

know what else to say. (*Id*.)

Plaintiff's adopted mother testified that plaintiff has a very volatile temper and that she

easily loses control.  (R. at 83.)  Plaintiff's mother also has witnessed plaintiff's panic attacks and

stated that plaintiff will get headaches, chest pain, and feel closed in and had difficulty breathing.

(R. at 84.)  She stated that plaintiff's panic attacks were sporadic and that she would have as

many as two or three a day. (R. at 85.)

The vocational expert ("VE") was asked a hypothetical question about whether a person

limited to heavy range exertion and limited to simple, routine tasks not performed in a production

or quota based environment, involving simple work related decisions, few workplace changes,

limited to occasional interaction with supervisors and no interaction with coworkers or the

general public could find any jobs that exist in the local or national economy.  (R. at 90.)  The

VE stated that such a person could work as a janitor, vehicle washer, light level office cleaner,

assembler, inspector, and sorter. (R. at 90-91.)  If the hypothetical person were further limited to

being unable to consistently follow even simple and routine instructions, the VE stated that there

would be no competitive work available. (R. at 91.)  The VE stated that for even simple, routine

and repetitive jobs the worker would be expected to be productive eighty-five to ninety percent of

the time and that workers could usually only miss one day a month.  (R. at 92.)  If a worker were

ill and could not meet those time expectations, then the worker would be given two warnings and let go after the third incident. (R. at 92-93.)

### *Legal Standard*

Judicial review of the Commissioner's denial of a claimant's benefits is proper pursuant to 42 U.S.C. § 405(g). This court must determine whether there is substantial evidence which supports the findings of the Commissioner. 42 U.S.C. § 405(g). Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co v. NLRB*, 305 U.S. 197, 229 (1938)). This deferential standard has been referred to as "'less than a preponderance of evidence but more than a mere scintilla.'" *Burns v. Barnhart*, 312 F.3d 113, 118 (3d Cir. 2002) (quoting *Jesurum v. Sec'y of Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995)). This standard, however, does not permit the court to substitute its own conclusions for that of the fact-finder. *Id.* (citing *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992)).

### *Discussion*

Under Title XVI of the Act, a disability is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c (a)(3)(A). Similarly, a person is unable to engage in substantial gainful activity when "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any

other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 1382c (a)(3)(B).

In order to make a disability determination under the Act, a five-step sequential evaluation must be applied.  20 C.F.R. §§ 404.1520, 416.920.  The evaluation consists of the following phases:  (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment; (3) if so, whether the claimant's severe impairment meets or equals the criteria of an impairment listed in 20 C.F.R. pt. 404, subpt. P, app. 1; (4) if not, whether the claimant's impairment prevents her from performing her past relevant work; and (5) if so, whether the claimant can perform any other work which exists in the national economy in light of her age, education, work experience, and residual functional capacity.  20 C.F.R. §§ 404.1520, 416.920; *Sykes v. Apfel*, 228 F.3d 259, 262-63 (3d Cir. 2000).  If the plaintiff fails to meet the burden of proving the requirements in the first four steps, the administrative law judge may find that the plaintiff is not disabled.  *Burns*, 312 F.3d at 119.  The Commissioner is charged with the burden of proof with respect to the fifth step in the evaluation process.  *Id.*

In the instant case, the ALJ found plaintiff will attain age twenty-two on April 28, 2010, and with respect to the sequential evaluation found (1) plaintiff had not engaged in substantial gainful activity since April 28, 2006; (2) plaintiff suffers from bipolar disorder and a history of ADHD, adjustment disorder, personality disorder, oppositional defiant disorder, anxiety, and drug and alcohol abuse; (3) plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1; (4) plaintiff does not have any past relevant work; and  (5) since plaintiff has the RFC to

perform work at any exertional level, but is limited to simple and routine tasks not performed in a production or quota-based environment involving only simple, work-related decisions, and in general, relatively few work place changes, is limited to occasional communication with supervisors, and must avoid communication with co-workers and the general public, there were jobs in the national economy that plaintiff could perform. (R. at 33-42.)

Plaintiff essentially raises two main issues:

1.    Whether the ALJ failed to consider properly and characterize all the evidence in the record.

2.    Whether the ALJ was biased against plaintiff and denied her a fair hearing.

Each of these issues will be addressed.


**I.    *Whether the ALJ failed to consider properly and characterize all the evidence in the record.***

An administrative law judge must do more than simply state factual conclusions, but instead must make specific findings of fact to support his or her ultimate findings. *Stewart*, 714 F.2d at 290. An administrative law judge must consider all medical evidence in the record and provide adequate explanations for disregarding or rejecting evidence, especially when testimony of the claimant's treating physician is rejected. *See Wier ex rel. Wier v. Heckler*, 734 F.2d 955, 961 (3d Cir. 1984); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981). He or she must also give serious consideration to the claimant's subjective complaints, even when those assertions are not confirmed fully by objective medical evidence. *See Mason v. Shalala*, 994 F.2d 1058, 1067-68 (3d Cir. 1993); *Welch v. Heckler*, 808 F.2d 264, 270 (3d Cir. 1986).

Should an administrative law judge conclude the claimant's testimony is not credible, the specific basis for such a conclusion must be indicated in his or her decision. *See Cotter*, 642 F.2d at 705. The Court of Appeals for the Third Circuit has stated:

> "in all cases in which pain or other symptoms are alleged, the determination or decision rationale must contain a thorough discussion and analysis of the objective medical and the other evidence, including the individual's complaints of pain or other symptoms and the adjudicator's personal observations. The rationale must include a resolution of any inconsistencies in the evidence as a whole and set forth a logical explanation of the individual's ability to work."

*Schaudeck*, 181 F.3d at 433 (quoting Social Security Ruling 95-5P).

In making his or her determination, and administrative law judge must consider and weigh all the evidence, both medical and nonmedical, that support a claimant's subjective testimony about symptoms and the ability to work and perform activities, and must specifically explain his or her reasons for rejecting such supporting evidence. *Burnett v. Comm'r of Soc. Sec.*, 220 F.3d 112, 119-20 (3d Cir.2000). Moreover, an administrative law judge may not substitute his or her evaluation of medical records and documents for that of a treating physician; "an ALJ is not free to set his own expertise against that of a physician who presents competent evidence" by independently "reviewing and interpreting the laboratory reports . . . ." *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985).

Plaintiff raises a number of instances where she argues that the ALJ either misrepresented the record or ignored evidence in coming to the conclusion that plaintiff was not disabled under the Act.

A.    **GAF Scores**

Plaintiff faults the ALJ for relying on plaintiff's highest GAF score in the record without

addressing or rectifying the apparent conflict with the remainder of the plaintiff's GAF scores.

As discussed above, plaintiff had many GAF assessments that ranged from 30 to 55.  The ALJ

stated in his decision:

> the mental status examinations by the claimant's treating mental
> health professionals have generally been unremarkable without any
> debilitating symptoms or findings and the claimant has been
> <u>assessed with GAF scores of 50 and 55 since September 2006</u>
> indicating she is not experiencing any debilitating symptoms.

(R. at 39)(emphasis added).  The ALJ used this finding as a part of his conclusion that the record

was not consistent with an individual with debilitating symptoms.  (*Id*.)  The ALJ, however, did

not address specifically the GAF scores assessed during plaintiff's November 2006 and January

2007 involuntary commitments that ranged between 30 and 42.  (R. at 452-53, 523.)

In discussing the involuntary commitments, the ALJ noted:  "the claimant has been

hospitalized for short periods on three occasions but the mental status examinations during the

hospitalizations have not revealed any significant findings or limitations."  (R. at 39.)  The ALJ

does not explain, however, what evidence he is relying upon to indicate that the hospitalizations

did not evidence any mental limitations.  The ALJ points out that plaintiff claimed that her sister

had her committed based upon false allegations.  The ALJ, however, did not address the inpatient

report where plaintiff denied that she had trouble with her temper and mood and denied that she

previously had slapped her principal.  (R. at 34, 521.)  Furthermore, the ALJ did not address that

during the November 2006 involuntary commitment, plaintiff had been hitting herself in the

stomach in the ER, tried to jump out of a moving vehicle, was violent during her first twenty-four hours in the unit and tried to escape. (R. at 507-13.)

There are conflicts between the GAF score of 55 and the lower scores found in the record. The ALJ did not adequately explain how the involuntary commitments fail to indicate significant mental limitations in light of the reports finding that plaintiff was violent and in denial about her condition. Since the ALJ "cannot reject evidence for no reason or for the wrong reason." *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (quoting *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999)), the ALJ on remand will have to address the reasons for rejecting the other GAF scores in the record and the limitations indicated by the inpatient reports during plaintiff's commitment. If the conflicts cannot be adequately addressed, on remand the ALJ should consider developing the record by requesting a consultative mental examination. See 20 C.F.R. §§ 404-1517; 416.917.

## B. Plaintiff's Mother's Testimony

The Act requires an administrative law judge to consider all available evidence in the claimant's case record. *Plummer*, 186 F.3d at 429. Social Security Ruling 06-03p details how an administrative law judge is to consider evidence from "other sources" to show the severity of the claimant's impairments and how it affects the claimant's ability to function. Social Security Ruling 06-03p, 2006 WL 2329939, at *2. "Other sources" is defined to include testimony from spouses, parents and other caregivers. The ruling provides:

> Information from these "other sources" cannot establish the existence of a medically determinable impairment. Instead, there must be evidence from an "acceptable medical source" for this purpose. However, information from such "other sources" may be based on special knowledge of the individual and may provide insight into the

severity of the impairment(s) and how it affects the individual's ability to function.

2006 WL 2329939, at *2. For "nonmedical sources" such as spouses, parents or friends, and administrative law judge should consider factors such as the nature and extent of the relationship, whether the evidence is consistent with other evidence, and any other factors that tend to support or refute the evidence.

Plaintiff argues that the ALJ failed to consider the statements from plaintiff's mother given at the hearing in determining the severity of plaintiff's symptoms. The ALJ commented on this testimony:

> The claimant's mother testified the claimant loses control of her temper easily, has panic attacks in which she experiences headaches, occasional chest pain, and can "slightly pass out," and experiences such attacks on a daily basis sometimes, and sometimes had up to three attacks a day. She further testified the claimant yells and cries a lot, holds her breath until she almost passes out, and cannot handle stress.

(R. at 38.) The ALJ mentioned this testimony in making the RFC assessment. Because the ALJ will need to readdress other evidence on remand, the ALJ should reassess the testimony of plaintiff's mother in light of the medical evidence.

## C. Factual Inaccuracies

Plaintiff attacks the ALJ's statements that plaintiff was without cognitive impairment as being factually inaccurate. (R. at 36.) The ALJ noted that "Dr. Ahmed reported in August 2006 the claimant was oriented in four spheres and did not have a cognitive impairment . . . ." (R. at 36; R. at 467.) Plaintiff, however, points to the repeated statements by plaintiff's physicians about her limited insight and poor judgment and points to the hospitalization following plaintiff's altercation with the school principal as evidence of poor judgment not addressed by the ALJ.

20

Plaintiff is correct that this evidence was not referenced by the ALJ in his discussion. The ALJ did mention the altercation between plaintiff and the school principal elsewhere in the decision, but did not refer to plaintiff being cited for disorderly conduct over the incident. The citation for disorderly conduct conflicts with the ALJ's finding that "the record is devoid of any legal involvement such as assault charges, animal cruelty, child protection investigations, and the like." (R. at 36.) The ALJ did not reference the instances of violence mentioned during plaintiff's involuntary commitment.

On remand, the ALJ will need to reconsider all this evidence and explain his findings. The ALJ should consider requesting a mental health examination by a psychiatrist to help resolve conflicts. See §§ 404-1517; 416.917.


## II. *Whether the ALJ was biased against plaintiff and denied her a fair hearing.*

Plaintiff claims that the ALJ's decision was the product of an unfair bias against claimants and as a result she was denied a fair hearing. The United States Court of Appeals for the Third Circuit has stated that remand to a different administrative law judge is appropriate where bias against the claimant has been proved. *Ventura v. Shalala*, 55 F. 3d 900, 901 (3d. Cir. 1995)(citing *Hummell v. Heckler*, 738 F.2d 91 (3d Cir. 1984)). An unbiased judge is essential to a fair hearing and is a requirement applied more strictly in administrative proceedings due to the absence of procedural safeguards available in judicial proceedings. *Id*. at 902. The Court of Appeals for the Third Circuit has held that where there is coercive, intimidating and offensive conduct by an administrative law judge that prevented a claimant from receiving a full and fair hearing, the claimant is entitled a new hearing before another administrative law. *Id.* at 904.

Plaintiff as evidence of bias points to blog comments made by the ALJ on September 6, 2008 and the ALJ's question posed to plaintiff during the May 30, 2007 hearing:

> Why should I not believe that you're just a spoiled kid who's trying your best to get some free money because as long as you complain everybody seems to want you know, help you out? Why shouldn't I think that you're not just working the system

(R. at 80.) The ALJ made no reference linked to plaintiff in comments attributed to him in the blog, which was more than a year after the ALJ rendered his decision. It would be speculative for this court to consider the blog comments in and of themselves evidence of bias in this particular case. The court is cognizant that it is the role of an administrative law judge to evaluate the credibility of witnesses at the hearing and is free to pose questions that may help in determining credibility. *See Van Horn v. Schweiker*, 717 F.2d 871, 873 (3d Cir. 1983). While the question in issue may be characterized as challenging and abrupt, it alone does not demonstrate bias. Although there is a need to remand this case, that need does not indicate that plaintiff was denied a fair hearing. Based upon a review of the record in its entirety, this court cannot find the ALJ is biased. Plaintiff did not adduce sufficient evidence to require that a different administrative law judge conduct the hearing on remand.

### Conclusion

After consideration of the cross-motions for summary judgment and the record as a whole, the court finds that substantial evidence does not exist in the record to support the ALJ's conclusion that plaintiff does not have a "disability" as defined in the Act. The cross-motions for summary judgment are **DENIED**. This case is remanded to the Commissioner for further proceedings consistent with this opinion.

An appropriate order follows.

By the court,

/s/ JOY FLOWERS CONTI
Joy Flowers Conti
United States District Judge

Dated:          September 14,  2010